1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

BYRON ISRAEL BROWN,              ) Case No. CV 13-5465-JPR
                                 )
                Plaintiff,       )
                                 )
          vs.                    ) **MEMORANDUM OPINION AND ORDER**
                                 ) **AFFIRMING THE COMMISSIONER**
                                 )
CAROLYN W. COLVIN,               )
Acting Commissioner of           )
Social Security,                 )
                                 )
                Defendant.       )
                                 )

**I.    PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision
denying his application for Social Security disability insurance
benefits ("DIB") and Supplemental Security Income benefits
("SSI").  The parties consented to the jurisdiction of the
undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  This
matter is before the Court on the parties' Joint Stipulation,
filed May 7, 2014, which the Court has taken under submission
without oral argument.  For the reasons discussed below, the
Commissioner's decision is affirmed and judgment is entered in
her favor.

1

## II.   BACKGROUND

Plaintiff was born on June 16, 1971.  (AR 77.)  He completed 11th grade.  (AR 43.)  He worked full time from 1991 to 2005 and sporadically through about 2007 selling and repairing musical instruments and accessories in a shop owned by his parents.  (AR 43-48, 73.)

On May 27, 2011, Plaintiff filed applications for DIB and SSI.  (AR 28, 150-63.)  He alleged that he had been unable to work since July 1, 2006, because of right-eye problems, right-eye cataracts, right-eye glaucoma, right-eye detached retina, kidney stones, kidney infections, headaches caused by eye problems, fatigue, flu-like symptoms, nausea, kidney pain, upset stomach, difficulty with reading and concentration, "[b]ad ankles," and anxiety caused by eye problems.  (AR 28, 150-63, 189.)  After Plaintiff's applications were denied initially and on reconsideration, he requested a hearing before an Administrative Law Judge.  (AR 115-16.)

A hearing was held on January 20, 2012, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert ("VE").  (AR 40-76.)  In a written decision issued February 21, 2012, the ALJ determined that Plaintiff was not disabled.  (AR 28-35.)  On February 23, 2012, Plaintiff requested Appeals Council review.  (AR 23.)  On June 27, 2013, the council denied the request.  (AR 1-4.)  This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and

1  supported by substantial evidence based on the record as a whole.
2  Id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v.
3  Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence
4  means such evidence as a reasonable person might accept as
5  adequate to support a conclusion.  Richardson, 402 U.S. at 401;
6  Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It
7  is more than a scintilla but less than a preponderance.
8  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.
9  Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether
10 substantial evidence supports a finding, the reviewing court
11 "must review the administrative record as a whole, weighing both
12 the evidence that supports and the evidence that detracts from
13 the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715,
14 720 (9th Cir. 1996).  "If the evidence can reasonably support
15 either affirming or reversing," the reviewing court "may not
16 substitute its judgment" for that of the Commissioner.  Id. at
17 720-21.

18 **IV.  THE EVALUATION OF DISABILITY**

19      People are "disabled" for purposes of receiving Social
20 Security benefits if they are unable to engage in any substantial
21 gainful activity owing to a physical or mental impairment that is
22 expected to result in death or which has lasted, or is expected
23 to last, for a continuous period of at least 12 months.  42
24 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257
25 (9th Cir. 1992).

26      A.   The Five-Step Evaluation Process
27      The ALJ follows a five-step sequential evaluation process in
28 assessing whether a claimant is disabled.  20 C.F.R.

3

§§ 404.1520(a)(4), 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform his past work; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The claimant has the

---

[1] RFC is what a claimant can do despite existing exertional and nonexertional limitations.  20 C.F.R. §§ 404.1545, 416.945; <u>see</u> <u>Cooper v. Sullivan</u>, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

burden of proving he is unable to perform past relevant work.
Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a
prima facie case of disability is established.  Id.  If that
happens or if the claimant has no past relevant work, the
Commissioner then bears the burden of establishing that the
claimant is not disabled because he can perform other substantial
gainful work available in the national economy.
§§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  That determination
comprises the fifth and final step in the sequential analysis.
§§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966
F.2d at 1257.

     B.   The ALJ's Application of the Five-Step Process

     At step one, the ALJ found that Plaintiff had not engaged in
any substantial gainful activity since July 1, 2006, his alleged
onset date.  (AR 30.)  At step two, he concluded that Plaintiff
had the severe impairments of "diabetic nephrolithiasis and a
visual impairment."[2]  (Id.)  At step three, he determined that
Plaintiff's impairments did not meet or equal any of the
impairments in the Listing.  (AR 32.)  At step four, the ALJ
found that Plaintiff had the RFC to perform light work requiring
only occasional depth perception and a limited field of vision.
(Id.)  Based on the VE's testimony, the ALJ concluded that
Plaintiff was able to perform his past relevant work as a
musical-instruments salesperson.  (AR 34.)  Accordingly, he
determined that Plaintiff was not disabled.  (AR 35.)

---

    [2] Nephrolithiasis means that kidney stones are present.
See Stedman's Medical Dictionary 1191 (27th ed. 2000).

5

**V. DISCUSSION**

Plaintiff claims the ALJ erred in assessing (1) his credibility and (2) nonexertional limitations arising from his visual impairment.  (J. Stip. at 3.)

    A.   <u>The ALJ Properly Assessed Plaintiff's Credibility</u>

        1.   <u>Applicable law</u>

An ALJ's assessment of symptom severity and claimant credibility is entitled to "great weight."  <u>See</u> <u>Weetman v. Sullivan</u>, 877 F.2d 20, 22 (9th Cir. 1989); <u>Nyman v. Heckler</u>, 779 F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  <u>Molina v. Astrue</u>, 674 F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks omitted).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  <u>See</u> <u>Lingenfelter</u>, 504 F.3d at 1035-36.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged."  <u>Id.</u> at 1036 (internal quotation marks omitted).  If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the <u>degree</u> of symptom alleged."  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).  When the ALJ finds a claimant's subjective complaints not credible, the ALJ must make specific findings that support the conclusion.  <u>See</u> <u>Berry v.</u>

1  Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent affirmative

2  evidence of malingering, those findings must provide "clear and

3  convincing" reasons for rejecting the claimant's testimony.

4  Lester, 81 F.3d at 834.  If the ALJ's credibility finding is

5  supported by substantial evidence in the record, the reviewing

6  court "may not engage in second-guessing."  Thomas v. Barnhart,

7  278 F.3d 947, 959 (9th Cir. 2002).

8                    2.  Relevant background

9      Plaintiff testified that his first bout of kidney-related

10  illness led to hospitalization in July 2006, but his doctors

11  thereafter "just seemed to be telling me to watch my diet and to

12  always [drink] a lot of water."  (AR 52.)  He said, however, that

13  he "started being sick all the time with what sort of feels like

14  a flu, with kind of a queasiness and stomach pains," and he had

15  recurrent kidney infections requiring brief hospitalizations.

16  (AR 53-54.)  He testified that he had learned to avoid

17  infections, primarily by drinking large amounts of water, but

18  still suffered kidney stones and pain.  (AR 53.)

19      Plaintiff testified that he had suffered eye problems

20  beginning in childhood but that they became more significant

21  following a major right-eye retinal detachment in 2006.  (AR 54-

22  55.)  That was repaired with surgery in August 2006, and

23  Plaintiff had other right-eye procedures in 2007 and 2010.  (AR

24  56.)  Plaintiff testified that as a result of his right-eye

25  problems and procedures, he could "sort of see colors and shapes,

26  but it's sort of like looking through 7up and wax paper" with his

27  right eye.  (AR 57.)  His left eye "[wa]s okay."  (Id.)

28      Plaintiff testified, however, that because his right eye had

                                  7

1 been his dominant eye, he sometimes had trouble reading or
2 concentrating on a computer screen, which gave him headaches and
3 made it difficult to concentrate.  (AR 57–58.)  Plaintiff had a
4 driver's license but drove only during the day.  (AR 43, 47, 58.)
5 He testified that although he had 20/30 eyesight in his left eye,
6 "on a grey day," "[t]he messed up [right] eye kind of takes
7 over."  (AR 58; see AR 484, 492 (2009 and 2011 eye
8 examinations).)

9     Plaintiff testified that he had not worked full time since
10 before his 2005 cataract surgery but that he had continued to
11 work when healthy until 2007, shortly before his parents sold
12 their business.  (AR 51, 60–63.)  He had been advised by his
13 doctors not to lift more than about 20 pounds so as to avoid
14 putting too much pressure on his right eye.  (AR 60.)  He said he
15 could "[s]ometimes" walk 30 minutes, did not require a cane,
16 could "[u]sually" stand for an hour, and could sit for two hours.
17 (Id.)[3]  Plaintiff testified that his general practitioner had
18 advised him to continue to exercise, and that he continued to try
19 to walk and hike, "but it's kind of limited."  (AR 65.)

20     On a normal day, Plaintiff drank a lot of water, went for a
21 walk, tidied the house, played guitar for about 45 minutes, and
22 checked email and used the computer until he got a headache,
23 usually after about 20 minutes.  (AR 66–67.)  He said that he was
24 incapacitated by his symptoms for about a week each month.  (AR
25 68.)  He testified that "the really strong [kidney] pain happens

---

27     [3] Significantly, Plaintiff's live-in girlfriend stated that
28 his conditions did not affect his ability to walk or stand.
(See AR 206 (question 22).)

maybe every [three] or four months" but that he suffered flu-like symptoms "almost every other week." (AR 69.)  When Plaintiff had kidney trouble, he slept irregularly.  (Id.)  He said he suffered "moderate headaches all the time" and "really extreme, kind of bone crushing headaches on the side of the right eye a few times a month." (AR 69-70.)  Plaintiff treated the pain with over-the-counter Tylenol.  (AR 70.)  His eye issues also caused claustrophobia and psychological discomfort in certain lighting because of his right-eye perception problems.  (AR 71-72.)

The VE testified that a person of Plaintiff's age, education, and work history who was limited to light work and "occasional field of vision" could do his past relevant work as a musical instruments and accessories salesperson.  (AR 72-74.)  In response to questioning by Plaintiff's attorney, the VE testified that such a person could not do Plaintiff's past work or maintain any other competitive employment if he were to miss two or three days of work a month because of health problems.  (AR 75-76.)

### 3.  Analysis

The ALJ discounted Plaintiff's symptom testimony because he found that neither the medical evidence nor Plaintiff's activities supported the alleged intensity, persistence, and limiting effects of Plaintiff's symptoms.  (AR 33.)  In particular, the ALJ rejected the suggestion that Plaintiff's impairments would cause him to miss two or three days of work a month.  (Id.)

#### a.  *Treatment records*

Plaintiff contends that the ALJ erred in finding his testimony that he would miss two or three days of work a month

because of his symptoms "unsupported by substantial objective,
medical and clinical evidence."  (AR 33; J. Stip. at 7.)
Plaintiff lists records confirming recurrent kidney stones and
repeated eye operations, but he does not explain how these
records support his claim that he would miss too much work to
maintain competitive employment.  (J. Stip. at 7-8; see AR 33.)

        The ALJ noted Plaintiff's diabetes-related "chronic kidney
infections and stones" and that the resulting "pain and fatigue
. . . limit his ability to lift/carry and perform other basic
work-related activities."  (AR 30.)  The ALJ further noted that
Plaintiff's first instance of kidney problems, in 2006, led to
serious illness but found no evidence of recent complications
warranting emergency-room or hospital treatment.  (Id.; see AR
468, 469 (in January and May 2011, Plaintiff reporting passage of
kidney stones that he apparently managed without seeking
treatment).)  As Plaintiff notes, he suffered kidney stones five
times in five years.  (See J. Stip. at 7; see AR 255, 273, 286,
468, 469.)  Although those incidents were undoubtedly very
painful, he had not suffered kidney stones frequently enough that
they would be expected to keep him out of work for two or three
days a month, or even every three to four months, as he
testified.  (AR 69 ("the really strong pain" came every three to
four months).)

        Moreover, as was evident from Plaintiff's testimony and
treatment records, he was able to manage his kidney ailments with
conservative care.  (See AR 33.)  Plaintiff testified that he
avoided kidney infections by regularly drinking large quantities
of water.  (AR 53.)  Although he sought emergency-room treatment

for his kidney stones in September 2006 and November 2008, in each case he was treated with fluids and medication and was discharged the same day. (See AR 273, 288, 290.) And when he had kidney stones in January and May 2011, Plaintiff sought no treatment, only reporting the passage of the stones to his physician at later appointments. (See AR 468-69.) His doctor encouraged him to maintain oral hydration and adhere to a low-salt, low-cholesterol, low-oxalate diet. (AR 33, 468-69.) Further, Plaintiff managed even his worst pain with nonprescription pain medication. (See AR 70, 211, 289.) Such conservative treatment undermines Plaintiff's contention of disabling symptoms. (See AR 33 (ALJ noting that "[d]espite [kidney] condition, the claimant was advised to participate in regular exercise activities, and just to 'avoid heavy weight bearing'")); Parra, 481 F.3d at 751 ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment.").

Although Plaintiff asserts that "[t]he objective evidence of glaucoma and additional retinal detachments is completely ignored by the ALJ in his decision" (J. Stip. at 8), the ALJ explicitly incorporated into Plaintiff's RFC his right-eye vision impairments, limiting him to "occasional depth perception" and "limited field of vision." (AR 32.) Moreover, as discussed further below, although Plaintiff suffered repeated right-eye retinal detachments, he retained 20/30 left-eye and combined visual acuity, including after his treatment for glaucoma. (AR 484, 492; see infra Sections V.A.3.b, V.B.)

It is true, as Plaintiff notes, that an ALJ may not

11

disregard a claimant's subjective-symptom testimony solely
because it is not substantiated affirmatively by objective
medical evidence. (See J. Stip. at 7 (citing Bunnell v.
Sullivan, 947 F.2d 341, 346-47 (9th Cir. 1991))); Robbins, 466
F.3d at 883.  The ALJ may, however, use the medical evidence in
the record as one factor in the evaluation.  See Burch v.
Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of
medical evidence cannot form the sole basis for discounting pain
testimony, it is a factor that the ALJ can consider in his
credibility analysis."); Carmickle v. Comm'r Soc. Sec. Admin.,
533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the
medical record is a sufficient basis for rejecting the claimant's
subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in
determining credibility, ALJ may consider "whether the alleged
symptoms are consistent with the medical evidence").  Here, the
ALJ properly noted the inconsistencies between Plaintiff's
medical records and his allegations of disabling kidney and eye
impairments in assessing his credibility.

            b.   *Dr. Rocelly Ella-Tamayo*

     Plaintiff also objects to the ALJ's reliance on the findings
of examining physician Rocelly Ella-Tamayo.  (J. Stip. at 8; AR
33.)  Dr. Ella-Tamayo performed a complete internal medicine
evaluation of Plaintiff on behalf of the agency on July 18, 2011.
(AR 486-91.)  She noted Plaintiff's repeated eye surgeries and
right-eye blindness, 2006 hospitalization for kidney infection,
and recurrent kidney stones and infections.  (AR 486-87.)  He
reported that he could walk six blocks and lift 25 pounds but
drove rarely.  (AR 487.)  Upon examination, Dr. Ella-Tamayo found

                              12

that glasses improved Plaintiff's decreased left-eye visual acuity but not his poor right-eye vision.  (AR 488.) Specifically, Plaintiff's right-eye vision was 20/200+ even with glasses, but glasses improved his left-eye and combined visual acuity to 20/30.  (See AR 492.)  She noted constricted pupils and inflamed retina.  (AR 488.)  The results of her examination were otherwise normal.  (See AR 488-90.)

Dr. Ella-Tamayo diagnosed poor right-eye vision and history of recurrent left-kidney stones.  (AR 490.)  She opined that Plaintiff should be restricted to pushing, pulling, lifting, and carrying 20 pounds occasionally and 10 pounds frequently "because of his retinal bleeding."  (Id.)  She found him capable of six hours of walking or standing in an eight-hour workday and unlimited sitting.  (Id.)  She assessed no other limitations.

Plaintiff does not specifically challenge any of Dr. Ella-Tamayo's findings.  He contends, however, that the ALJ erred in relying on her opinion because she was a Board-eligible, not Board-certified, internist whose license was to expire on March 31, 2012; she examined Plaintiff only once; and she reviewed only one medical record, documenting his 2010 eye surgery.  (J. Stip. at 8.)  First, although the doctor indicated in June 2011 that her license would expire in March 2012 (see AR 491), she was indisputably licensed at the time of Plaintiff's examination and has since renewed her license.[4]  She did not need to be Board-

_____

[4] The license to practice medicine in California must be renewed every two years.  See Physicians and Surgeons License Renewal, Med. Bd. of Cal., http://www.mbc.ca.gov/Licensees/License_Renewal/Physicians_and_Surgeons.aspx (last visited Sept. 3, 2014).  Dr. Ella-Tamayo's license to practice medicine remains

certified to practice medicine in California,[5] nor does Plaintiff allege that her training was inadequate to permit a thorough and valid examination.  See Kladde v. Astrue, No. ED CV 07-01439(SH), 2009 WL 838104, at *5 (C.D. Cal. Mar. 26, 2009) (finding record supported ALJ's decision to give greater weight to examining doctor when Plaintiff did not allege that his Board-eligible status rendered him unable to conduct valid assessment).

Second, a physician need not have examined the claimant at all to offer an opinion in a Social Security case.  See Lester, 81 F.3d at 830 (noting that treating, examining, and nonexamining physicians may offer opinions).  The fact that Dr. Ella-Tamayo examined Plaintiff, however, adds to the weight due her opinion. Id. (noting that treating physician's opinion is generally entitled to more weight than that of examining physician, and examining physician's opinion to more weight than that of nonexamining physician).  §§ 404.1527(c)(1), 416.927(c)(1); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (holding examining physician's opinion "alone constitutes substantial evidence, because it rests on his own independent examination of [claimant]").

_____

current through March 31, 2016.  See License Details, Cal. Dep't of Consumer Affairs, https://www.breeze.ca.gov/datamart/details CADCA.do?selector=false&selectorType=&selectorReturnUrl=&anchor= cd31f38.0.0 (last visited Sept. 3, 2014).

[5] A physician becomes Board eligible upon completion of the training necessary for Board certification in a given specialty. See General Policies & Requirements, Am. Bd. of Internal Med., http://www.abim.org/certification/policies/general-policies-requirements.aspx (last visited Sept. 3, 2014).  Board eligibility lasts seven years or until the physician passes the examination for certification in a given specialty.  Id.

Third, although Dr. Ella-Tamayo did not review the entirety of Plaintiff's medical history, she reviewed records pertaining to his most recent right-eye surgery and recorded Plaintiff's reports of eye procedures, right-eye glaucoma, and chronic kidney infections and stones, including a kidney stone passed only a week before the examination. (AR 486-87.) Plaintiff proffers no basis for thinking that the records provided, his report of his symptoms and medical history, and Dr. Ella-Tamayo's physical, musculoskeletal, and neurological examinations of him provided an insufficient or inaccurate basis for her functional assessment. See Orn v. Astrue, 495 F.3d 625, 631-32 (9th Cir. 2007) (ALJ entitled to rely on opinion of examining doctor that is supported by independent clinical findings); Castaneda v. Astrue, 344 F. App'x 396, 398 (9th Cir. 2009) (holding ALJ did not err in relying on examining doctor's assessment even if doctor did not review all medical records).

### c.   *Daily activities*

Plaintiff contends that the ALJ erred in finding his symptom testimony inconsistent with his "extensive activities of daily living." (AR 33; J. Stip. at 5.) The ALJ noted that Plaintiff and his girlfriend reported his regular activities to include "cooking, cleaning, doing the dishes, cleaning the shower, occasionally watering the lawn, running errands, caring for a cat,[6] going for coffee, driving on familiar streets in the daytime, shopping for food and guitar parts, playing a guitar and performing small repairs and modifications, going to a local

---

[6] This apparently included regularly giving him medicine in addition to food and water. (AR 202, 212-13.)

restaurant or occasionally to the post office, networking with others, watching television, surfing the internet, going for walks, and vacuuming." (AR 33 (citing AR 201-19); <u>see also</u> AR 65 (Plaintiff still walked and hiked), 66-67 (on average day, Plaintiff walked, tidied house, played guitar, and checked email and used computer).) Plaintiff also testified that he still played in a band, which performed in public one or two times a year. (AR 47.) He also sometimes played in friends' bands, to "help[] [them] out." (AR 48.) Further, on his function report he indicated that he rode a bicycle for transportation in addition to walking and driving. (AR 215.)

Although Plaintiff does not dispute that he is able to do these things, he contends that they represent no more than "some limited activities of daily living." (J. Stip. at 6.) The ALJ properly found, however, that Plaintiff's and his girlfriend's statements show that he spent "a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." <u>Morgan v. Comm'r of Soc. Sec. Admin.</u>, 169 F.3d 595, 600 (9th Cir. 1999) (finding claimant's ability to fix meals, do laundry, do yardwork, and occasionally care for friend's child evidence of ability to work); <u>see</u> <u>Thomas</u>, 278 F.3d at 959 (finding claimant's ability to "perform various household chores such as cooking, laundry, washing dishes, and shopping" was specific and legitimate reason to discount credibility of her allegations); <u>Orteza v. Shalala</u>, 50 F.3d 748, 750 (9th Cir. 1995) (ALJ was permitted to consider that claimant "performed various household chores such as cooking, doing the dishes, going to the store,

visiting relatives, and driving" in assessing credibility).

Claimant emphasizes his statements that his activity level varied with pain and fatigue, he cooked only simple foods and did so less frequently than previously, and he did guitar repair work less often than before his vision worsened.  (J. Stip. at 6.) The ALJ noted, however, that Plaintiff's activities were subject to restrictions.  (See, e.g., AR 30 (noting that Plaintiff's "nephrolithiasis causes him to experience pain and fatgue which in turn limit his ability to lift/carry and perform other basic work-related activities"), 31 (noting that his "limited visual acuity on the right" would cause "difficulty performing tasks requiring depth perception"), 33 (noting that he drove only "on familiar streets in the daytime" and only "occasionally" visited post office).)  To the extent these activities are inconsistent with Plaintiff's claims of disabling impairments, however, the ALJ was entitled to rely on them in discounting his credibility. See Molina, 674 F.3d at 1113 ("Even where [claimant's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.").

On appellate review, this Court is limited to determining whether the ALJ properly identified reasons for discrediting Plaintiff's credibility.  Smolen, 80 F.3d at 1284.  The inconsistencies between Plaintiff's allegations and the medical evidence, his daily activities, and his conservative treatment were proper and sufficiently specific bases for discounting his claims of disabling symptoms, and the ALJ's reasoning was clear and convincing.  See Tommasetti v. Astrue,

1   533 F.3d 1035, 1039-40 (9th Cir. 2008); <u>Houghton v. Comm'r Soc.</u>

2   <u>Sec. Admin.</u>, 493 F. App'x 843, 845 (9th Cir. 2012).  Because the

3   ALJ's findings were supported by substantial evidence, this Court

4   may not engage in second-guessing.  <u>See</u> <u>Thomas</u>, 278 F.3d at 959;

5   <u>Fair v. Bowen</u>, 885 F.2d 597, 604 (9th Cir. 1989).

6        Plaintiff is not entitled to remand on this ground.

7        B.   <u>The ALJ Properly Considered Plaintiff's Visual</u>

8             <u>Impairment in Formulating His RFC</u>

9        Plaintiff contends that by limiting him to jobs requiring

10  only "occasional depth perception" and "limited field of vision,"

11  the ALJ did not adequately account for Plaintiff's nonexertional

12  limitations, "such as pain, headaches, double vision, decreased

13  concentration, anxiety and fatigue."[7]  (AR 32; J. Stip. at 13.)

14       As explained above, the ALJ properly determined that

15  Plaintiff's allegations were not wholly credible.  Thus, he was

16

17  _____

18       [7] Plaintiff also complains that the ALJ's depth-perception
    limitation was erroneous because, "[g]iven that depth perception
19  is dependent upon the use of both eyes and Plaintiff only has
    vision in one eye, he would have no depth perception."  (J. Stip.
20  at 18.)  He cites no authority for this proposition, which
    appears to be inaccurate.  <u>See, e.g.</u>, Thomas Politzer,
21  <u>Implications of Acquired Monocular Vision (Loss of One Eye)</u>,
    <u>available at</u>: Neuro-Optometric Rehabilitation Ass'n,
22  https://nora.cc/for-patients-mainmenu-34/loss-of-one-eye-mainmenu
    -70.html (last visited Sept. 12, 2014) ("Absence of stereopsis
23  does not mean the individual will have no depth perception. . . .
    [T]here are monocular cues to depth that can be learned through
24  experience.  Problems with depth perception can be addressed by
    visual rehabilitation training for eye hand coordination,
25  relative depth judgment and spatial orientation.").  In any
    event, the ALJ recognized that Plaintiff was "legally blind in
26  the right eye" (AR 33), and his hypothetical to the VE included
    that Plaintiff "would have occasional depth perception, limited
27  field of vision; by that I mean he can only see out of one eye"
    (AR 73).
28

1  required to include in his RFC determination only those

2  limitations he found credible and supported by substantial

3  evidence. See Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir.

4  2005); Hayee v. Comm'r of Soc. Sec., 532 F. App'x 690, 691 (9th

5  Cir. 2013).

6      Moreover, although Plaintiff contends that the ALJ failed to

7  summarize the objective evidence of his eye impairments, the ALJ

8  in fact noted Plaintiff's "bilateral cataract surgeries,"

9  "recurrent retinal detachments," right-eye sclera buckle surgery,

10 right-eye "pars plana vitrectomy, membrane peel, endolaser

11 photocoagulation, air fluid exchange and silicone implantation,"

12 and second vitrectomy three years later. (AR 30-31.)  The ALJ

13 further found that Plaintiff's "limited visual acuity" would

14 cause "difficulty performing tasks requiring depth perception."

15 (AR 31.)  The ALJ also noted, however, that although Plaintiff

16 was legally blind in his right eye, his corrected left-eye and

17 combined visual acuity was 20/30.  (AR 33; see AR 492; see also

18 AR 33 (noting 20/25 visual acuity in 2009).)  To the extent

19 Plaintiff asserts that the ALJ should have summarized the eye-

20 impairment evidence in greater detail, he was not required to do

21 so.  See Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012

22 (9th Cir. 2003) ("[I]n interpreting the evidence and developing

23 the record, the ALJ does not need to 'discuss every piece of

24 evidence.'").

25     Plaintiff also contends that the ALJ erred in failing to

26 incorporate into the RFC additional limitations based upon the

27 July 5, 2011 letter from optometrist Irene N. Sang.  (J. Stip. at

28 15; see AR 484.)  Although Dr. Sang noted that Plaintiff had been

a patient in her office since May 1994 and she was thus familiar
with his "previous history of very high myopia and multiple
surgical repairs," she had seen him only once after July 2005, in
November 2009. (AR 484.) Dr. Sang was therefore unable to
provide very recent findings or opine as to Plaintiff's visual
function as of the date of her letter. She reported that when
she saw Plaintiff in November 2009, his corrected right-eye
visual acuity was 20/400, corrected left-eye visual acuity was
20/25-30, and intraocular pressures were normal, and he was being
treated for right-eye glaucoma. (Id.) Dr. Sang was otherwise
able to say only that, based upon Plaintiff's medical history, he
"likely has some difficulty reading" because of his decreased
right-eye acuity and that such difficulty "could . . . effect
[sic] his ability to concentrate for long periods of time."
(Id.)

Although Plaintiff contends that "[t]here is no reference or
summary of this report in the ALJ's decision" (J. Stip. at 15),
the ALJ in fact explicitly relied upon Dr. Sang's findings that
Plaintiff's "corrected visual acuity in his better eye is 20/25"
in assessing whether his eye impairments met a Listing (AR 32
(citing AR 484)). Notably, Dr. Sang's findings are consistent
with those of Dr. Ella-Tamayo that Plaintiff had corrected left-
eye and combined visual acuity of 20/30 in July 2011. (AR 33,
492.) Thus, although Plaintiff continued to suffer eye issues
requiring medical treatment after his 2009 visit with Dr. Sang
(see AR 484 (noting 2010 oil-removal procedure and 2009 treatment
for glaucoma)), his corrected eyesight remained the same. Dr.
Sang's objective findings based on her November 2009 examination

of Plaintiff did not, therefore, warrant limitations beyond those in his RFC.

To the extent Dr. Sang purported to opine as to Plaintiff's eye function and limitations as of July 2011, her statements were not based on any recent findings but, rather, were little more than speculation, albeit informed by her familiarity with Plaintiff's eye-treatment history.  She emphasized that her first-hand familiarity with Plaintiff's then-current medical status was limited.  (See, e.g., AR 484 ("I have only seen him once after July, 2005").)  Moreover, her opinion as to Plaintiff's "likely" difficulty reading and possible difficulty concentrating was based upon his report of symptoms, which the ALJ properly discounted insofar as they were inconsistent with his medical records and daily activities.[8]  The ALJ fairly disregarded that portion of her opinion.  See Fair, 885 F.2d at 605 (finding ALJ properly disregarded physician's opinion when it was premised on claimant's subjective complaints, which ALJ had already discounted).

The RFC thus properly included those visual limitations that the ALJ found credible and supported by record evidence. See Bayliss, 427 F.3d at 1217; cf. Robbins, 466 F.3d at 886.

Remand is not warranted on this basis.

---

[8]Moreover, optometrists are limited to providing evidence for "purposes of establishing visual disorders." §§ 404.1513(a)(3), 416.913(a)(3).  Dr. Sang's opinion concerning Plaintiff's ability to concentrate may be too far afield from "establishing a visual disorder" to count as coming from an acceptable medical source.

**VI.  CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[9] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: September 16, 2014

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[9]  This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."